UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

DALE REA and LISA REA,                )
                                      )
      Plaintiffs,                    )
                                      )
  v.                                  )   Case No. 07-1024
                                      )
RAIL AMERICA, INC., Successor By      )
Merger to TOLEDO, PEORIA, WESTERN     )
RAILWAY CO.,                          )
                                      )
      Defendants.                    )

# O R D E R

This matter is now before the Court on Rail America, Inc.'s Motion for Summary Judgment. For the reasons set forth below, Rail America's Motion for Summary Judgment [#34] is DENIED.

## BACKGROUND

Plaintiff Dale Rea ("Rea") began working for the Toledo, Peoria & Western Railway Company (the "Railroad") in 1979. He worked for the Railroad until he was injured in March 2001; his injury prevented him from returning to work. During the time that Rea worked for the Railroad, he and his spouse, Plaintiff Lisa Rea ("Mrs. Rea"), always had full health insurance coverage.

The Railroad continued to pay Rea's wages and health benefits through the end of 2001. Rea received a letter informing him of his right to purchase continuation of coverage under COBRA sometime in late September or October 2001. (Rea Dep. at 52) It is undisputed that Rea did not return the forms attached to this letter to Rail America. Rea

asserts that he did not return the forms because he was advised by Harmon Cook ("Cook"), a private investigator and former Norfolk & Western Railway Company claims representative that Rea had retained to assist him with his state court litigation, that Rail America was continuing to pay his wages and health care benefits. Rea apparently assumed that these payments would continue indefinitely and relied on Cook to handle the continuation of his wages and health insurance.

Rea admits that he understood that COBRA was a continuation of insurance coverage that he had to pay for himself. Rea was subsequently presented with monthly receipts for cash advance forms from the Railroad that he signed and returned to Rail America. He knew that the amounts being advanced to him were to pay for his health insurance or to keep his coverage intact and that such amounts would be used as a setoff if he recovered in his state court litigation. (Rea Dep. at 43, 45-46) The total amount advanced to Rea to continue his health insurance coverage was $46,557.52. However, he insists that he never applied for COBRA coverage and denies understanding that his insurance was being provided pursuant to COBRA at the time.

The Reas received a COBRA continuation invoice dated September 13, 2002, showing their monthly premium as $1,004.70. They received a letter from Great West Insurance dated October 3, 2002, notifying them that they were within six months of the date that their COBRA coverage would expire. They then received a second letter dated December 9, 2002, indicating that their COBRA coverage had expired because no premium payment had been received. Thereafter, Cook and the Reas' attorney spoke to Rail America with regard to reinstating the Reas' insurance coverage, and as a result of the agreement reached, Rail America continued to pay the Reas' medical benefits through

January 27, 2004. Rea has not obtained any replacement health insurance coverage since that time.

The Reas filed the present Complaint on January 26, 2007, alleging that Rail America's breach of its obligation to notify them of Rea's termination as an employee entitled them to receive benefits, continuation coverage under COBRA, and statutory penalties. Rail America has now moved for summary judgment, and this Order follows.

## LEGAL STANDARD

Summary judgment should be granted where "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party has the responsibility of informing the Court of portions of the record or affidavits that demonstrate the absence of a triable issue. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The moving party may meet its burden of showing an absence of disputed material facts by demonstrating "that there is an absence of evidence to support the non-moving party's case." Id. at 325. Any doubt as to the existence of a genuine issue for trial is resolved against the moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986); Cain v. Lane, 857 F.2d 1139, 1142 (7th Cir. 1988).

If the moving party meets its burden, the non-moving party then has the burden of presenting specific facts to show that there is a genuine issue of material fact. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986). Federal Rule of Civil Procedure 56(e) requires the non-moving party to go beyond the pleadings and produce evidence of a genuine issue for trial. Celotex, 477 U.S. at 324. Nevertheless, this Court

must "view the record and all inferences drawn from it in the light most favorable to the [non-moving party]." Holland v. Jefferson Nat. Life Ins. Co., 883 F.2d 1307, 1312 (7th Cir. 1989). Summary judgment will be denied where a reasonable jury could return a verdict for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Hedberg v. Indiana Bell Tel. Co., 47 F.3d 928, 931 (7th Cir. 1995).

## DISCUSSION

The Consolidated Omnibus Budget Reconciliation Act ("COBRA") requires health insurance plan administrators "to provide continued health insurance coverage to covered employees and their qualified beneficiaries and to notify them of the right to elect such coverage upon the occurrence of a 'qualifying event.'" 29 U.S.C. § 1161. A "qualifying event" is further defined as:

> [A]ny of the following events which, but for the continuation coverage required under this part, would result in the loss of coverage of a qualified beneficiary . . . (2) The termination (other than by reason of such employee's gross misconduct), or reduction of hours, of the covered employee's employment.

29 U.S.C. § 1163. "Failure to provide the required notice can result in a court ordering a plan administrator . . . to pay a statutory fine, of up to $100 per day, and attorney's fees." Mlsna v. Unitel Communications, Inc., 41 F.3d 1124, 1129 (7th Cir. 1995), citing 29 U.S.C. § 1132(c)(1).

Rea was injured and stopped working in March 2001. The Railroad initially continued to pay his wages and regular benefits. At some point in mid- to late 2001, Rea applied for a disability annuity through the Railroad Retirement Board. Rea was then advised that if he wanted to continue to receive his salary, it would be in the form of a cash

advance that would have to be paid back eventually.  Cook testified that Rea declined to continue to receive wages if he would have to pay it back.

On October 12, 2001, Rail America sent a letter to Rea enclosing information on continuing his health insurance under COBRA.  This letter stated that his "health insurance coverage expires on 10/01/2001" and advised that he must complete and return the attached Health Continuation Election Form to continue his coverage past that date.  Also included was a Health Benefit Continuation Notice (the "Notice") stating that his coverage would normally terminate on 10/1/2001 as a result of the qualifying event of his reduction of hours worked.  The Notice advised Rea of his right to continue his coverage until the earliest of the following dates: (1) the date on which he becomes covered by any other group health plan; (2) the date on which he becomes entitled to coverage under Medicare; (3) the date on which the Plan terminates; (4) the date 18 months from the date of the qualifying event.  In the event that Rea elected to continue his coverage, the Notice directed him to complete and return the Health Continuation Election Form within 60 days of the date the Notice was sent and pay the initial premium required within 45 days of the date he completed the form.  The Notice further advised that if he did not complete the Health Continuation Election Form and return it within the time limit, "you will lose your right to elect the Health Benefit Continuation."

There is really no dispute that the Reas received the October 12, 2001, letter including the Notice and Health Continuation Election Form.  Nor can there be any non-frivolous dispute that the Notice adequately advised them of their right to obtain continuation coverage and the process for doing so.  Rather than contacting Rail America or following the procedures to elect coverage, the Reas chose to seek  advice from their

private investigator, Cook, and their attorney, William Kozol ("Kozol"), neither of whom was an authorized agent of Rail America. They were advised to do nothing based on the assumption that he was still an employee because the company was continuing to pay his wages and benefits. The Reas relied on this advice and did not return the Election Form.

Despite this reliance and resultant failure to take the steps necessary to elect continuation coverage, the Reas admit that they continued to receive coverage. At some point in 2002, after the Railroad stopped paying his regular wages and benefits, the way the Reas received their health insurance coverage changed. Cook spoke with Rail America and reached an agreement whereby Rail America would give cash advances to Rea to cover the costs of his health insurance premiums. Rea began to routinely sign receipts for these advanced funds understanding that the advances were to pay for their health insurance premiums. They also understood that these advanced funds would be used as a setoff against any recovery they might receive in their state court litigation.

Although the Reas deny understanding that this coverage was being provided under COBRA, the above-referenced documents that were sent to them by Rail America and Great West made reference to the coverage being provided pursuant to COBRA, as well as the fact that Rea had experienced a qualified event as a result of his reduction in hours worked. However, the record reveals some justification for their belief that they were not receiving their health insurance through a COBRA plan. After receiving these documents, the Reas contacted Cook, who contacted Terry Rhine ("Rhine"), the Senior Claims Manager at Railroad Risk Management with whom he had been dealing regarding this situation. Cook testified in his deposition that Rhine repeatedly told him not to worry about

the COBRA notices because the Reas were not on COBRA. (Cook Dep. at 78-79, 84-85, 89)

Despite the Reas' lack of understanding, they did apparently receive COBRA benefits for a period that began in March 2002 and continued for just under two years. This arrangement was made through Cook and Kozol in early 2002, when Cook contacted Railroad Risk Management to determine if Rea could have his heath insurance coverage reinstated. Cook was advised that Rea could reinstate his health insurance coverage and that the Railroad would continue to advance him the monthly amount if he would agree to convert his already paid salary continuance into advances.

The Reas cannot in good faith deny that following his injury, he was not working and therefore lacked the hours worked to maintain his entitlement to his regular health insurance benefits. Nor can they deny that Rail America ceased paying his wages and regular benefits in late 2001. It is also clear that a reduction in hours worked is a qualifying event that triggers the entitlement to continuation coverage under COBRA. 29 U.S.C. § 1163.

Rea argues that the qualifying event is the cessation of his wage payments on November 30, 2003, and that Rail America does not identify the qualifying event that triggered its COBRA notice obligation. However, these arguments are contradicted by the evidence of record. First, the October 12, 2001, Notice clearly indicates the reduction of his hours worked following his injury as the qualifying event triggering the availability of continuation coverage. Second, in his response to Defendants Statement of Undisputed Facts, Rea states that "Rail America, Inc. paid Dale Rea's wages through December 21, 2001." (Response, at ¶ 8) Rea further identifies Cook's deposition as the evidence in

support of the November 30, 2003, date.  In reading the portion cited, Cook actually indicates that Rea stopped receiving wage continuation payments in December 2001 after applying for disability, as Railroad Retirement Board rules precluded him from applying for disability while receiving wage continuation payments.  (Cook Dep. at 64)  Thus, any suggestion that Rail America continued to pay his wages through November 30, 2003, is simply without merit.

Cook also confirms that Rail America's payment of Rea's benefits ceased in late 2001.  If Rea wanted to continue to be covered by health insurance, he had to pay for it himself, which was accomplished by the cash advances from Rail America beginning in April 2002.  Id., at 65-66.  Although the Railroad appears to have continued Rea's health insurance benefits for a period of time following his injury, a December 17, 2001, letter from Rhine to Kozol takes the position that Rea was not entitled to any form of health care coverage except through the COBRA plan, and that the Railroad would advance the amount of his COBRA coverage per month if he agreed to convert whatever salary continuance that he had received into advances as well.  Kozol appears to have accepted the offer, as memorialized in a March 22, 2002, letter from Kozol to Rhine.  In this letter, Kozol requests the reinstatement of the Reas' insurance coverage and states that while he disagreed that Rea should pay the COBRA payments, that could be litigated at a later time because it was essential that the coverage be reinstated.

An employee's period of available continuation coverage begins with the qualifying event rather than the final loss of coverage itself.  Gaskell v. Harvard Cooperative Society, 3 F.3d 495, 499-501 (1st Cir. 1993) (discussing the legislative history behind COBRA); Mlsna, 41 F.3d at 1128 (agreeing with the holding in Gaskell.)  Where the qualifying event

is the reduction in hours, the Seventh Circuit's decision in <u>Mlsna</u> clarified that the reduction in hours becomes a qualifying event when the reduction reaches the point of losing coverage. <u>Id.</u> Thus, the qualifying event in this case occurred whenever Rea's reduction in hours following his injury caused him to lose his coverage.

Here, although Rea's hours were reduced almost immediately following his injury in March 2001, there is a genuine issue of material fact as to when the reduction actually caused him to lose coverage. The Railroad initially continued to pay his wages and benefits following his injury, which at first blush appeared to have prevented Rea's reduction in hours from actually causing him to lose benefits until late 2001. However, the December 17, 2001, letter from Rhine reveals that the Railroad later took the position that Rea had not been entitled to these continuation payments and that Rea had to agree to retroactively convert them to cash advances. If the latter position is accepted by the trier of fact, then it would be reasonable to conclude that Rea's reduction in hours caused him to lose his benefits almost immediately following his injury in March 2001.

Thus, on the record in this case there are at least two possible conclusions that can be reached regarding the date that Rea actually lost his coverage, requiring resolution after consideration of evidence not presently before the Court and an assessment of credibility that would not be appropriate on summary judgment. Additionally, given the confusing and apparently incomplete state of the record in this matter, the Court cannot rule out that evidence not in the record could supply a basis for finding that his loss of benefits occurred on yet another date. That being said, regardless of which date is ultimately found to have been the qualifying event in this case, the record now before the Court does not permit a finding as a matter of law that the October 12, 2001, Notice was timely.

COBRA requires that an employer notify the plan administrator of the occurrence of a qualifying event within 30 days of the date of the qualifying event. 29 U.S.C. § 1166(a)(2). The plan administrator must then notify the employee of his right to elect continuation coverage within 14 days thereafter. 29 U.S.C. §§ 1166(a)(4) and (c). Given the evidence of record in light of these requirements, the timing of the October 12, 2001, Notice simply does not make sense. If the qualifying event was his reduction in hours in March 2001 followed by immediate loss of coverage (i.e., the position asserted in the December 17, 2001, Rhine letter), then the statutory notice should have been given no later than early May 2001. If on the other hand, the qualifying event was his reduction in hours that did not result in any loss of coverage until December 2001 (i.e., the position suggested in Cook's testimony and by the fact that Rail America did initially continue to pay Rea's wages and benefits), then the qualifying event did not occur until December 2001, and the statutory notice should have been given sometime in mid-February 2002.

Rail America has given no real explanation for the alleged timeliness of its October 12, 2001, Notice. Nor is there any indication in the pleadings as to why the Reas' regular insurance coverage allegedly terminated on 10/1/2001 as stated in that Notice. Dismayed by the lack of attention given to this potentially dispositive issue in the briefs, the Court scoured the record, not unlike a pig in search of truffles, in an attempt to find some explanation. But alas, no such explanation could be found after hours of reviewing the exhibits tendered by the parties. Accordingly, the Court must conclude that a genuine issue of material fact with respect to the date of the qualifying event and timeliness of the COBRA notice precludes the entry of summary judgment in this case.

**CONCLUSION**

For the reasons set forth above, Rail America's Motion to Dismiss [#34] is DENIED.

This matter remains set for final pretrial conference on February 12, 2009.

ENTERED this 9th day of December, 2008.

                                              s/Michael M. Mihm
                                                 Michael M. Mihm
                                          United States District Judge